# United States Court of Appeals
# For the First Circuit

No. 07-2401

UNITED STATES OF AMERICA,

Appellee,

v.

DOUGLAS HERSOM,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Torruella, Boudin, and Dyk,[*]
Circuit Judges.

David Shaughnessy for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief for appellee.

December 3, 2009

---

[*] Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**.    This is an appeal from a criminal conviction of arson in the United States District Court for the District of Maine.  Defendant Douglas Hersom pled guilty to a charge that he maliciously destroyed by fire a building owned by an institution "receiving Federal financial assistance" in violation of 18 U.S.C. § 844(f).  On appeal, Hersom contends that his conviction should be reversed because the statute is unconstitutional, or that the statute should be construed to be inapplicable to the circumstances of his case.  Alternatively, he contends that resentencing is required because the district court erroneously determined that he was a career offender under the U.S. Sentencing Guidelines ("Guidelines").  U.S. Sentencing Guidelines Manual § 4B1.1 ("U.S.S.G.").

We conclude that 18 U.S.C. § 844(f), as properly construed, is a permissible exercise of Congress's power under the Property Clause of the Constitution.  U.S. Const. art. IV, § 3, cl. 2.  We also hold that the statute is applicable in the circumstances of this case, and thus we affirm the conviction.  Finally, we vacate the sentence and remand for resentencing in light of this Court's intervening decision in United States v. Giggey, 551 F.3d 27 (1st Cir. 2008) (en banc).

**I.**

On May 24, 2007, defendant Hersom pled guilty to one count of arson in violation of 18 U.S.C. § 844(f).  Hersom stipulated that on December 19, 2006, he, co-defendant Timothy

-2-

Giggey, and an unnamed juvenile male intentionally set three separate fires which ultimately destroyed the entire block of four buildings located from 159 to 177 Lisbon Street in Lewiston, Maine. The specific property listed in the indictment, 171 Lisbon Street, was owned by Greely Capital, LLC ("Greely"). The City of Lewiston provided financing to renovate the properties (in the amount of $50,000), utilizing funds obtained through a Community Development Block Grant ("CDBG") from the U.S. Department of Housing and Urban Development ("HUD").

At the sentencing hearing, the court determined that Hersom was a career offender under U.S.S.G. § 4B1.1 because he had two predicate offenses. Hersom's two prior felony convictions included a March 2000 conviction for burglary of a dwelling structure and a February 2004 conviction for burglary of a commercial structure. The court sentenced Hersom to 151 months in prison and ordered him to pay restitution of $351,333.33. Hersom timely appealed, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Following oral argument, we requested supplemental briefing concerning the proper construction of 18 U.S.C. § 844(f) and the constitutionality of the statute as so construed.

## II.

### A. The Scope of 18 U.S.C. § 844(f)

Congress enacted 18 U.S.C. § 844(f) as part of Title XI of the Organized Crime Control Act of 1970. Pub. L. No. 91-452, 84

Stat. 922, 957 (codified as amended in scattered sections of 18 U.S.C.). The statute makes it a crime to destroy

> by means of fire or an explosive, any building, vehicle, or other personal or real property <u>in whole or in part owned or possessed by, or leased to</u>, the United States, or any department or agency thereof, or <u>any institution or organization receiving Federal financial assistance</u>.

18 U.S.C. § 844(f)(1) (emphases added). Section 844(f) was promulgated pursuant to Congress's power under the Property Clause of the Constitution. H.R. Rep. No. 91-1549 (1970), <u>as reprinted in</u> 1970 U.S.C.C.A.N. 4007, 4046. The Property Clause of the Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2.

On appeal, Hersom argues that to pass constitutional muster, section 844(f) must be interpreted as applying only to property owned, possessed, or leased by the United States, its departments and agencies, and property owned, possessed, or leased by "federal instrumentalities," i.e. institutions or organizations "substantially funded by the federal government and effectuating a specific Congressional purpose."[1] Appellant's Br. 51. Thus,

---

[1] The government contends that defendant did not raise and preserve the issue of the constitutionality or construction of 18 U.S.C. § 844(f). Hersom contends that the issue is jurisdictional and that in any event the issue was not waived because trial counsel provided ineffective assistance. We need not determine whether the issue is waived in light of our disposition.

Hersom's theory is that the federal government's power under the Property Clause does not extend beyond property owned, possessed, or leased by the federal government and its instrumentalities. However, the Supreme Court, in a case curiously not cited by either party, has held that the Property Clause authority is not so limited. In Ruddy v. Rossi, 248 U.S. 104, 106-07 (1918), the Court upheld under the Property Clause provisions of the Homestead Act, Pub. L. No. 37-64, 12 Stat. 392 (1862), that provided that federal lands transferred to settlers by the United States could not be reached under state law to satisfy debts contracted prior to the transfer. 248 U.S. at 106. Thus, at least in some circumstances, Congress may properly enact legislation under the Property Clause power governing the conduct of third parties with respect to property not owned, possessed, or leased by the United States, its agencies, or its instrumentalities where such regulation is necessary to protect property acquired from the federal government.

Hersom alternatively contends that section 844(f) should be construed to be limited to "federal instrumentalities," because of the Supreme Court's decision in United States v. Walter, 263 U.S. 15 (1923). In Walter, Congress had enacted a federal criminal statute punishing fraud against "any corporation in which the United States of America is a stockholder." 263 U.S. at 16; see Act of October 23, 1918, Pub. L. No. 65-228, 40 Stat. 1015. The defendant had defrauded the United States Emergency Fleet Corporation ("Fleet Corporation"), a corporation in which the

United States owned all of the stock. Walter, 263 U.S. at 16. The Court held that the criminal statute "should be construed to refer only to corporations like the Fleet Corporation that are instrumentalities of the government and in which for that reason it owns stock," in order to avoid the constitutional issue raised by interpreting the statute to encompass "any corporation in which the United States owned a single share of stock." Id. at 17-18. However, Walter does not compel a "federal instrumentalities" construction of section 844(f). Nothing in the Court's opinion in Walter foreclosed the possibility that some other federal interest in property, more substantial than ownership of a "single share of stock," would be sufficient to withstand constitutional scrutiny.

Moreover, the language of the 1918 Act was ambiguous as to what level of stock ownership was sufficient to trigger coverage under the statute. In contrast, section 844(f) expressly applies to "any institution or organization receiving Federal financial assistance." The legislative history accompanying the recent 2002 amendment to section 844(f) (restoring the federal financial assistance language) also does not suggest that section 844(f) is limited to "federal instrumentalities." See Homeland Security Act, Pub. L. No. 107-296, § 1125, 116 Stat. 2135, 2285. That history contains no reference to "federal instrumentalities," and refers to institutions or organizations "receiving Federal financial assistance." See 18 U.S.C. § 844(f); H.R. Rep. No. 107-658, at 5-6 (2002).

Hersom makes two additional arguments in favor of his "federal instrumentality" construction, neither of which we find persuasive. First, Hersom correctly points out that the legislative history of an earlier version of the statute containing the "Federal financial assistance" language stated that it applied to "universities, hospitals, and police stations." Appellant's Br. 46; H.R. Rep. No. 91-1549, as reprinted in 1970 U.S.C.C.A.N. at 4014. But we do not think this suggests that the statute is limited to federal instrumentalities; if anything, it suggests the contrary. Second, Hersom argues that in United States v. Kimberlin, the Seventh Circuit adopted a "federal instrumentality" construction. 805 F.2d 210 (7th Cir. 1986). It is true that the Seventh Circuit suggested that the statute applied only to "federal instrumentalities," but the court's definition of a federal instrumentality was quite different from Hersom's. In Kimberlin, the court viewed a federal instrumentality as an institution which "effectuates a national program with federal funds." Id. at 242. This is a much broader construction than Hersom advocates, and is analogous to the construction we adopt below.

While neither the statutory text nor the legislative history sheds adequate light on the precise scope of "receiving Federal financial assistance," the phrase is used in other federal statutes and regulations.[2] The Supreme Court has recognized that

---

[2] See, e.g., 6 C.F.R. § 17.105(9) (defining "Federal financial assistance" with respect to Title IX for the Department of Homeland

in general, similar language used in federal statutes should be given a similar construction, unless the purpose of the statute or its legislative history suggests otherwise. In <u>Rutledge</u> v. <u>United States</u>, the Court adopted the analysis of the plurality opinion in <u>Jeffers</u> v. <u>United States</u>, 432 U.S. 137 (1977), in which Justice Blackmun interpreted the phrase "in concert" in 21 U.S.C. § 848 to connote "cooperative action," because "in concert" had been similarly construed in other federal statutes. <u>Rutledge</u>, 517 U.S. 292, 299 n.10, 300 (1996). Absent "any indication . . . to the contrary" in the legislative history or elsewhere, it appeared that Congress intended the same words to have the same meaning in section 848. <u>Id.</u> at 299 n.10 (quoting <u>Jeffers</u>, 432 U.S. at 149). Similarly, in <u>Reina</u> v. <u>United States</u>, the Court interpreted the phrase "in any court" in 18 U.S.C. § 1406 to cover both federal and

_____

Security as a "grant or loan of Federal financial assistance," a "grant of Federal real or personal property or any interest therein," "[p]rovision of the services of Federal personnel," "[s]ale or lease of Federal property or any interest therein at nominal consideration or at consideration reduced for the purpose of assisting the recipient," and "[a]ny other contract, agreement, or arrangement that has as one of its purposes the provision of assistance to any education program or activity"); 7 C.F.R. § 15.2(g) (defining "Federal financial assistance" for the Department of Agriculture with respect to effectuation of Title VI of the Civil Rights Act of 1964 as including "(1) grants and loans of Federal funds, (2) the grant or donation of Federal property and interests in property, (3) the detail of Federal personnel, (4) the sale and lease of, and the permission to use (on other than a casual or transient basis), Federal property or any interest in such property or the furnishing of services without consideration or at a nominal consideration, or at a consideration which is reduced for the purpose of assisting the recipient, . . . and (5) any Federal agreement, arrangement, or other contract which has as one of its purposes the provision of assistance").

state prosecutions because the same language in other statutes had been so construed. 364 U.S. 507, 510 (1960).

The Court's precedent interpreting the meaning of "receiving Federal financial assistance" in the civil rights statutes is thus illuminating. See, e.g., Grove City College v. Bell, 465 U.S. 555, 569-70 (1984). In those cases, the Supreme Court held that the statutes covered organizations that are "intended recipients" of federal financial assistance, even if the aid flowed through a conduit. In Grove City College v. Bell, the Supreme Court considered the meaning of the phrase within the context of Title IX, 20 U.S.C. § 1681, which prohibits sex discrimination in "any education program or activity receiving Federal financial assistance." Grove City, 465 U.S. at 563-70. Grove City, a private college, declined to participate in all federal financial aid programs that would have provided funds directly to the university. Id. at 561. However, it enrolled a number of students who received Basic Educational Opportunity Grants ("BEOGs") from the federal government. Id. The Court concluded that, although Grove City received federal financial assistance indirectly, it was nonetheless an "intended recipient" of federal financial assistance, and Title IX was applicable to the institution. Id. at 569-70. Thus, a private college receiving indirect federal financial assistance through student educational grants was held to be "receiving Federal financial assistance." Id.

Hersom correctly points out that not all beneficiaries of federal funding fall into the category of organizations "receiving Federal financial assistance," relying on United States Department of Transportation v. Paralyzed Veterans of America, 477 U.S. 597 (1986). At issue in Paralyzed Veterans was the applicability of section 504 of the Rehabilitation Act, which prohibits discrimination against any qualified handicapped individual in "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (1982). The court of appeals concluded that section 504 applied to all air carriers by virtue of the extensive program of federal financial assistance provided to airports under the Airport and Airway Development Act of 1970, Pub. L. No. 91-258, 84 Stat. 219, and the Airport and Airway Improvement Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, 671 (1982). Paralyzed Veterans, 477 U.S. at 603. The Supreme Court reversed, holding that the intended recipients of federal financial assistance under the statutes were the operators of the airports, not the air carriers:

> It is not difficult to identify the recipient of federal financial assistance under these Acts: Congress has made it explicitly clear that these funds are to go to airport operators. Not a single penny of the money is given to the airlines. Thus, the recipient for purposes of § 504 is the operator of the airport and not its users.

Id. at 605 (emphasis in original); see also National Collegiate Athletic Ass'n v. Smith, 525 U.S. 459, 468 (1999) ("Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX;

-10-

entities that only benefit economically from federal assistance are not.").

We view these Supreme Court cases as establishing that the term "Federal financial assistance" generally refers to entities receiving federal funds–directly or indirectly–so long as they are the intended recipients of the federal legislation providing the assistance. We see no reason why section 844(f) should be interpreted differently.

The statute presents a second interpretive question: whether the statute applies to arson of all property owned or possessed by the organization receiving federal financial assistance. In the case of an organization whose operations are substantially or primarily funded by the federal government, we have little doubt that the statute applies to all of the organization's property. Indeed, the legislative history of section 844(f) seems to confirm the applicability of the statute in such situations. The House Report explains that the provision was designed "[t]o permit the Federal Government to more directly participate in the investigation and prosecution of the recent rash of attacks on ROTC facilities and other buildings on college campuses culminating in the tragedy at the University of Wisconsin." H.R. Rep. No. 91-1549, as reprinted in 1970 U.S.C.C.A.N. at 4046. The University of Wisconsin incident alluded to was the August 1970 bombing of the Army Mathematics Research Center at the University of Wisconsin, an Army-funded think tank.

See Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary, 91st Cong. 324-25 (1970) (Letter of Hon. Henry C. Schadeberg, Member of Congress).  We need not address here the scope of the statute in other situations dissimilar from the present case where a different federal interest might be implicated.  See Sabri v. United States, 541 U.S. 600 (2004) (construing federal bribery statute to apply to organizations receiving federal benefits even though bribery did not relate to federal benefits; Court recognized federal interest in preventing all bribery of such institutions).

However, we do think it both appropriate and necessary to determine the scope and constitutionality of the statute in situations such as in this case, where the federal financial assistance is limited to the acquisition, renovation, or lease of a specific property.  A question exists as to whether section 844(f) should be limited to the property acquired, renovated, or leased using federal financial assistance, or whether 844(f) applies to all property owned or possessed by the organization.  We conclude that, in general, the statute should be limited to arson of property acquired, renovated, or leased using federal financial assistance.

First, there is no legislative history suggesting that Congress intended section 844(f) to cover all property owned, possessed, or leased by institutions receiving federal financial assistance designed to enable them to acquire, renovate, or lease

-12-

specific property, and the government has identified no federal interest that would be served by such an expansive interpretation.

Second, the legislative history suggests that Congress intended the scope of the statute to be co-extensive with its authority under the Property Clause, and was primarily concerned with the authority of the United States "to protect its own property." H.R. Rep. No. 91-1549, as reprinted in 1970 U.S.C.C.A.N. at 4046. The House Report on the Organized Crime Control Act of 1970 stated that Congress "relies for its constitutional base on the power of the Federal Government to protect its own property," and cites two other analogous statutes involving theft of government property, 18 U.S.C. § 641, and willful destruction of government property, 18 U.S.C. § 1361. H.R. Rep. No. 91-1549, as reprinted in 1970 U.S.C.C.A.N. at 4046. No Property Clause case has been called to our attention suggesting that Congress has the authority under that clause to regulate conduct of third parties directed at those who own, possess, or lease federal property or use federal funds to do so unless that conduct at least relates to the property, as was the case in Ruddy v. Rossi. 248 U.S. at 106-07; see also Kleppe v. New Mexico, 426 U.S. 529, (1976) (holding that the protection of wild horses on public lands was a valid exercise of Congress's power under the Property Clause to make rules regarding the use of federal property). The application of the Necessary and Proper Clause adds little to the analysis.

We are also obligated to construe the statute to avoid constitutional questions that would be presented by a broad construction. See Jones v. United States, 529 U.S. 848, 857 (2000) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."); Edward J. DeBartolo Corp. V. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988) ("[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality."). The Court's decision in Jones is particularly instructive. There, the Court sought to construe language in 18 U.S.C. § 844(i), which prohibits the use of "fire or an explosive" to damage or destroy "any . . . property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." The Court concluded that while the statute excluded no particular type of building, a private, owner-occupied residence was not "used" in interstate commerce under the statute. Jones, 529 U.S. at 856. The Court declined to adopt the government's expansive interpretation of section 844(i), noting that under such a construction, "hardly a building in the land would fall outside the federal statute's domain." Id. at 857.

Similarly, applying section 844(f) to all property of any organization "receiving Federal financial assistance" would give the statute a sweeping scope. In the present economy, a wide variety of organizations, both private and non-profit, receive some

-14-

form of federal financial assistance to acquire, renovate, or lease specific property. Applying the statute to cover all property owned by such entities would transform a broad swathe of "traditionally local criminal conduct" into a "matter for federal enforcement." Id. at 858. The interpretive canon against construing statutes to have the effect of significantly altering the federal-state balance in the prosecution of crime would thus appear to apply here with full force. See id. at 858 (citing United States v. Bass, 404 U.S. 336, 349 (1971)). The doctrine of lenity, requiring criminal statutes to be construed narrowly, also suggests a narrowing construction. See Rewis v. United States, 401 U.S. 808, 812 (1971).

Thus, in the case of organizations receiving federal financial assistance related to specific property, we construe section 844(f) as limited in general to arson of that particular property.[3] In holding that section 844(f) is generally limited to property owned or possessed using federal financial assistance, we do not foreclose the possibility that the statute should be construed to apply in some limited instances to non-federally funded property where federal interests are implicated, for example, because the proximity of the federally funded and non-

---

[3] We recognize that our construction is contrary to a decision by the Tenth Circuit. See United States v. Apodaca, 522 F.2d 568, 571-72 (10th Cir. 1975). However, it does not appear that the legislative history of the statute or concerns about the constitutional power of Congress were either raised or discussed in that case.

-15-

federally funded property creates a risk of injury to federal property from arson as to the non-federal property.

### B. Application to Hersom's Case

Applying the statutory construction we have proposed, we conclude that § 844(f) is constitutional and that it applies to Hersom's conduct in this case.

First, Greely, the owner of the property, received federal funds through the City of Lewiston, and thus is in fact an intended recipient of federal financial assistance. The CDBG program provides annual grants on a formula basis to units of local government and states in order to further broad community development objectives. The statute specifies that the "[t]he primary objective . . . of the community development program of each grantee under this chapter is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." 42 U.S.C. § 5301(c). It further requires that "not less than 70 percent of the aggregate of the Federal assistance . . . shall be used for the support of activities that benefit persons of low and moderate income." Id.

Defendant argues that the City of Lewiston, rather than Greely, was the intended recipient of CDBG funding. Units of state and local government are certainly intended recipients of the CDBG program. The money flows directly to local governments: the statute provides that "[t]he Secretary is authorized to make grants

-16-

to States, units of general local government, and Indian tribes to carry out activities in accordance with the provisions of this chapter." Id. at § 5303. States and units of local governments are the entities that must develop and submit a comprehensive planning document and application for funding to HUD. In its Consolidated Plan, the jurisdiction must outline its projected use of funds and demonstrate how its expenditures will serve the enumerated national objectives. See id. at § 5304; 24 C.F.R. § 570.200.

However, the statute also specifically envisions a role for private entities in achieving the community development objectives of the statute. Most relevantly, the statute specifically enumerates certain activities that may be carried out by for-profit organizations: "Activities assisted under this chapter may include . . . provision of assistance to private, for-profit entities, when the assistance is appropriate to carry out an economic development project . . . ." 42 U.S.C. § 5305(a)(17) (emphasis added). The statute further authorizes the Secretary to extend federal loan guarantees to public agencies for various purposes, including the private economic development activities enumerated in § 5305(a)(17). 42 U.S.C. § 5308; 24 C.F.R. § 570.700-.711. Thus, the text of the statute demonstrates that private developers such as Greely engaged in economic development activities are in fact "intended recipients" of the federal financial assistance.

-17-

Furthermore, the property in this case was renovated using federal loan funds. Hersom appears to concede on appeal that the buildings that were the subject of the arson were renovated using a $50,000 loan from the City of Lewiston through the HUD block grant, and, in any event, the Pre-Sentence Investigation Report ("PSI") indicates that this is the case. PSI 4. Because this appeal follows a guilty plea, we draw the relevant facts from the uncontested portions of the PSI and the transcript of the sentencing hearing. United States v. Dietz, 950 F.2d 50, 51 (1st Cir. 1991). Those facts in the PSI lend support to the guilty plea.

We therefore conclude that the statute was properly applied in Hersom's case.

### III. Sentencing

We turn to the sentencing issue. Hersom contends that the court improperly treated him as a career offender for Sentencing Guidelines purposes because arson of a commercial building is not a predicate offense. This Court's recent en banc decision in United States v. Giggey, 551 F.3d 27, 28-29 (1st Cir. 2008), abrogates the rule established in United States v. Fiore, 983 F.2d 1, 4-5 (1st Cir. 1992), which held that prior conviction for a burglary of a non-dwelling structure is per se a crime of violence under the Guidelines. Giggey held that in order to determine whether a defendant's prior convictions for non-residential burglary constituted "crimes of violence," the district

-18-

court was required to use the "categorical approach," comparing the elements of the state crime against the requirement in U.S.S.G. § 4B1.2(a)(2) that the offense involve conduct that "presents a serious potential risk of physical injury to another." <u>Giggey</u>, 551 F.3d at 38-40. As the government conceded in its brief, remand is thus necessary in order to enable the district court to decide whether Hersom's second career offender predicate is a "crime of violence."

## IV. CONCLUSION

For the reasons set forth above, we affirm the judgment of conviction, vacate the sentence, and remand to the district court for resentencing.

<u>It is so ordered.</u>

No Costs.